IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-11172
_____

GLORIA D. NEWTON,

Plaintiff-Appellant,

versus

KENNETH S. APFEL, COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
_____

April 25, 2000

Before HIGGINBOTHAM and PARKER, Circuit Judges, and ATLAS, District Judge[1]

ATLAS, District Judge:

Plaintiff, Gloria D. Newton, filed a civil action under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Newton's claim for disability insurance benefits under Title II of the Social Security Act. The district court affirmed the decision of the Commissioner, and Newton appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

Because the Administrative Law Judge ("ALJ") failed to give sufficient weight to the opinion of Newton's treating physician without requesting additional information, erred in

_____

[1]    District Judge of the Southern District of Texas, sitting by designation.

relying exclusively on the medical-vocational guidelines, and improperly failed to consider Newton's ongoing treatment when assessing Newton's ability to work, we reverse and remand for additional consideration by the ALJ consistent with this opinion.

## I.     FACTUAL AND ADMINISTRATIVE BACKGROUND

Newton applied for disability insurance benefits on December 15, 1992, alleging disability as the result of systemic lupus erythematosus ("SLE"). Newton subsequently amended her claim to allege entitlement to a closed period of disability insurance benefits beginning May 2, 1989 and ending September 12, 1994. Newton requested a hearing before an ALJ, and ALJ Rebecca Westfall held a hearing February 13, 1995 in Fort Worth, Texas. Newton was represented by counsel.

On September 15, 1995, the ALJ ruled that Newton was not disabled according to the Medical-Vocational Guidelines[2] because she had the residual functional capacity to perform work not exceeding the sedentary level of exertion. The Appeals Council denied Newton's request for review of her case on May 9, 1997, leaving the ALJ's decision to stand as the final decision of the Commissioner.

Newton worked through May 1, 1989, when she stopped working because chest pain and swelling in her feet and knees made it too painful to stand. Newton returned to part-time employment as a silk-screener on September 12, 1994, working 25-30 hours a week.

The medical evidence in the record dated back to September 1989 and established without contradiction that Newton suffered from SLE since 1989. Her condition was

---

[2]     *See* 20 C.F.R. Part 404, Subpart P, App. 2.

identified by her treating physician, Raymond M. Pertusi, D.O., a rheumatologist. In summary, the ALJ found that Newton intermittently experienced swollen and painful joints, pleuritic chest pain, fevers, fatigue, a rash, and kidney or urinary problems. Pertusi had prescribed a regimen of Prednisone, Plaquenil and other medications to control the SLE and associated symptomatology. During the period of claimed disability, Newton's condition required emergency room treatment on no fewer than nine occasions, and Newton was admitted to the hospital for treatment on at least four occasions. Newton was examined and treated by Pertusi frequently throughout the period.

Pertusi continued to see Newton after she returned to part-time work in September 1994. On February 1, 1995, Newton complained of bilateral hip and leg pain and pain across her shoulders. She reported at that time taking 6-7 Advil before going to work. She had mild swelling in her right hand. Pertusi again diagnosed SLE and possible Sjogrens' syndrome. He prescribed Daypro for her pain and advised that she stop taking Advil.

On April 5, 1995, Newton reported being ill with the shakes and chills, pain in the right eye and nose, and chest pain when she inhaled. Pertusi diagnosed sinusitis, otitis media, and other ear problems. Based on Newton's statement that the Daypro upset her stomach, Pertusi discontinued that prescription.

On July 24 and 28, 1996, in connection with Newton's application for food stamps from the Texas Department of Human Services, a physician, Dr. Carrera, completed a disability statement and certified that Newton was disabled by SLE and could not work.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

The federal courts review the Commissioner's denial of social security benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)*; Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). If the Commissioner's findings are supported by substantial evidence, they must be affirmed. *Martinez*, 64 F.3d at 173. "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (internal quotations omitted); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The court does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *See Brown*, 192 F.3d at 496. "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Id.* (quoting *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)).

### B.    Standard for Entitlement to Social Security Benefits

The claimant has the burden of proving she has a medically determinable physical or mental impairment lasting at least twelve months that prevents her from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.

4

20 C.F.R. § 404.1572(a) and (b). The ALJ uses a five-step sequential process to evaluate claims of disability and decides whether: (1) the claimant is not working in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's impairment meets or equals a listed impairment in Appendix 1 of the Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other work. 20 C.F.R. § 404.1520.

The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner for the fifth step. Thus, the claimant must show first that she is no longer capable of performing her past relevant work. 20 C.F.R. § 404.1520(e). If the claimant satisfies this burden, then the Commissioner must show that the claimant is capable of engaging in some type of alternative work that exists in the national economy. *See Chaparro v. Bowen,* 815 F.2d 1008, 1010 (5th Cir. 1987). Once the Commissioner makes this showing, the burden of proof shifts back to the claimant to rebut this finding. *Id*.

## III. DISCUSSION

In her appeal from the final decision of the Commissioner and on appeal before this court, Newton argues that the ALJ failed to give proper weight to the opinion of Newton's treating physician, erroneously relied on the medical-vocational guidelines, and improperly failed to consider Newton's ongoing medical treatment when assessing her ability to work. Newton also argues that the Appeals Council failed to consider new evidence presented on appeal.

### A.    Consideration of Treating Physician's Opinion

Newton argues that the ALJ erred as a matter of law by failing to give proper weight to the opinion of her treating physician.  Specifically, Newton argues that the ALJ failed to comply explicitly with applicable Social Security Administration ("SSA") regulations for evaluating a treating physician's opinion.

The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).  Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

#### 1.    Medical Opinions Presented to ALJ

Newton's treating physician, Dr. Pertusi, is an Assistant Professor of Medicine and Rheumatology at the Texas College of Osteopathic Medicine.  Pertusi submitted an assessment, dated January 30, 1995, stating that Newton could occasionally lift up to ten pounds; stand or walk less than two hours per regular work day; sit continuously for thirty minutes at a time, for a total of two hours out of an eight-hour work day; and stand, walk and sit for a combined total of three hours out of an eight-hour work day.  Pertusi also found Newton was able to reach and handle items and occasionally balance, stoop, kneel, crouch,

6

crawl, reach or drive, but she could not climb or perform repetitive operations of foot controls. Pertusi also stated that Newton should avoid temperature extremes. Pertusi asserted that Newton had been under these restrictions since December 1989 through the date of his assessment. Pertusi based his assessment on diagnoses of SLE, polyarthritis, fatigue and anemia. He stated that Newton suffered from impairments that could reasonably be expected to produce pain or other symptoms.

Pertusi also responded to interrogatories from Newton's attorney. In the responses, Pertusi asserted that the diagnosis of SLE was supported by documented episodes of fatigue, fever, pleuritic chest pain and cognitive changes; findings of synovitis, polyarthritis, and a malar rash; and laboratory results consistent with lupus. He noted that the clinical records showed at least three months of active disease despite prescribed treatment, and further noted that the disease had remained active or was expected to remain active for at least 12 months. He indicated that Newton had exhibited symptoms of severe fatigue, fever, malaise, and weight loss. In addition, her lupus resulted in the moderate involvement of her joints; mild involvement of the muscles in the form of myalgias; moderate to marked pleuritic chest pain; mild renal involvement in the form of persistent proteinuria; mild skin involvement because of a recurring malar rash; and mild or subtle decline in cognitive function. He stated that the degree of fatigue that could reasonably be expected to result from SLE would prevent Newton from performing sustained work activities, even of a sedentary nature.

Medical expert Otto Willbanks also testified before the ALJ. Willbanks noted that Newton's SLE was well established and was documented in the record. Based on his review of the medical records, Willbanks stated that Newton experienced intermittent joint and

muscle pain, intermittent chest pain, and a rash characteristic of SLE. He observed that there was some interference with kidney function as well, but he could not determine the extent.

Willbanks testified that the record did not contain sufficient information regarding the degree of severity of any of the complicating factors, although he noted that many of Newton's problems were denoted as mild at various points in the record. He testified that the record did not indicate that Newton's lupus (or the related complications) met the criteria for any listed impairment. Willbanks stated that Pertusi's office notes failed to document the frequency of Newton's lupus flare ups and the extent or degree of severity of her symptoms. Willbanks observed that the record showed Newton suffered from relapses of arthralgias, possibly arthritis, and swelling, but that he saw no records indicating that Newton's condition was, at any time, totally non-responsive to medication.

Willbanks reviewed Pertusi's interrogatory responses. He criticized Pertusi for listing the complications that occurred from time to time without providing the frequency, degree, or manner they interfered with Newton's activities. Willbanks testified that he did not see medical evidence to suggest that Newton's flare ups would prevent her from performing a job that involved sitting six to eight hours a day, but admitted that he also saw no evidence that she could perform such a job.

### 2. The ALJ's Decision

The ALJ found that Newton had not engaged in substantial gainful activity between May 1, 1989 and September 12, 1994, the period of claimed disability (first step of the five-step process). The ALJ also found that Newton suffered from SLE, a "severe" impairment

(second step), but that Newton's impairment did not meet or equal the severity of any listed impairment for which she would be found presumptively disabled (the third step).

The ALJ then addressed whether Newton retained the residual functional capacity to perform either her past relevant work (fourth step) or some lesser level of work activity (fifth step). The ALJ rejected Newton's testimony regarding her pain and functional limitations. The ALJ found that Newton retained the residual functional capacity to perform the exertional requirements of a full range of sedentary work, which precluded her from performing her past relevant work. The ALJ considered Newton's relatively young age, high school education, and past work experience. The ALJ applied the Medical-Vocational Guidelines without a vocational expert and entered a finding that Newton was not under a disability at any time through the date of her decision.

The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council. *See Knipe v. Heckler*, 755 F.2d 141, 149 n.16 (10th Cir. 1985) (citing *Dong Sik Kwon v. INS*, 646 F.2d 909, 916 (5th Cir.1981) (*en banc*)).

### 3. ALJ's Failure to Give Treating Physician's Opinions Proper Weight

The ALJ correctly placed the burden on Newton at the fourth step of the five-step process. It appears, however, that the ALJ did not properly place the burden on the Commissioner at the fifth step. The ALJ stated that Pertusi's opinions regarding the claimant's residual functional capacity, specifically his opinion that Newton could not perform even sedentary work during the period of claimed disability, were not entitled to "great weight." In actuality, the ALJ gave Pertusi's opinions *no* weight. The ALJ found

Pertusi's opinion regarding residual functional capacity was not reliable because it was insufficiently substantiated by clinical or diagnostic evidence, and thus was conclusory. The ALJ also faulted Pertusi for failing to include work restrictions for Newton in his medical notes and contemporaneous records during the 1989-1994 period, finding that this omission undermined Pertusi's credibility as to his assessment of claimant's residual functional capacity. The ALJ also rejected Pertusi's opinions because of the inconsistency between Pertusi's January 30, 1995 opinion that Newton was totally disabled and the fact that at the time of Pertusi's opinion Newton was working 25-35 hours per week.[3]

***Requirements for Giving Weight to Treating Physicians' Opinions*. --** The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Martinez*, 64 F.3d at 176 (citing 20 C.F.R.

---

[3] To the extent the ALJ relied on Newton's late 1994 through January 1995 part-time work as support for the finding that Newton had the residual functional capacity to perform sedentary work during prior periods, the finding is not supported by substantial evidence in the record. Newton's ability to work part-time after the claimed disability period, and only if medicated for pain, is not evidence of Newton's ability to work from May 1989 to September 1994. Additionally, Newton's sincere desire to work, and her efforts to do so on a part-time basis, should not be perverted into evidence that she could have worked during the preceding four years.

§ 404.1527(d)(2)). "The opinion of a specialist generally is accorded greater weight than that of a non-specialist." *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has sole responsibility for determining a claimant's disability status." *Id.* "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Id.* The treating physician's opinions are not conclusive. *See Brown*, 192 F.3d at 500. The opinions may be assigned little or no weight when good cause is shown. *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See, e.g., Brown*, 192 F.3d at 500; *Greenspan*, 39 F.3d at 237; *Paul*, 29 F.3d at 211.

***Factors to be Considered Before Declining to Give Treating Physicians' Opinions Controlling Weight*. --** SSA Regulations provide that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion" and list factors an ALJ must consider to assess the weight to be given to the opinion of a treating physician when the ALJ determines that it is not entitled to "controlling weight." *See* 20 C.F.R. § 404.1527(d)(2). Specifically, this regulation requires consideration of:

(1)     the physician's length of treatment of the claimant,

11

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole; and

(6)     the specialization of the treating physician.

The regulation is construed in Social Security Ruling ("SSR") 96-2p, which states:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. ***Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.*** In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

SSR 96-2p, 61 F.R. 34490, 34491 (July 2, 1996) (emphasis added).  SSR 96-5p provides, with respect to "Residual Functional Capacity Assessments and Medical Source Statements," that "Adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 . . . , providing appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 61 F.R. 34471, 34474 (July 2, 1996).

Several federal courts have concluded that an ALJ is required to consider each of the § 404.1527(d) factors when the ALJ intends to reject or give little weight to a treating specialist's opinion. *See Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998); *Goatcher v. U.S. Department of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995); *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 228 (N.D.N.Y. 1998); *Amidon v. Apfel*, 3

12

F. Supp. 2d 350, 355-56 (W.D.N.Y. 1998); *McDonald v. Apfel*, No. CA 3-97-CV-2035R, 1998 WL 159938, *8 (N.D. Tex. Mar. 31, 1998). This court now similarly holds that an ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist. The ALJ failed to perform this analysis, which should be conducted on remand.

### *ALJ's Improper Reliance on Non-Treating, Non-Examining Physician*. --

The ALJ expressly relied for her findings on the testimony of the medical expert, Willbanks, and her own disbelief of portions of Newton's own testimony. There is no indication that Willbanks had any training in rheumatology. Willbanks, who did not examine Newton personally, agreed that Newton suffered from SLE. Willbanks's opinion was based primarily on his review of Pertusi's assessments and answers to interrogatories. While Willbanks apparently had access to Pertusi's treatment notes, he did not have all the significant hospitalization records, including records of a five-day hospitalization in 1993. Willbanks's opinion also did not take into account other medical opinions supporting Newton's claim of disability, such as a hospital note from Dr. Fehl that "Newton's pain was due to her progressively increasing and spreading joint pain secondary to her lupus" and the July 28, 1996, statement from Dr. Carrera, another examining physician, that Newton could not perform even sedentary work due to her lupus. Willbanks commented that the records were insufficient for him to determine the severity and frequency of the symptoms, but he did not testify that Pertusi's findings or answers should be discredited because they were conclusory. Willbanks found that Newton's symptoms were typical for a patient with SLE,

13

and that generally the symptoms were responsive to treatment. Willbanks, however, failed to consider the side-effects of the treatments.

The ALJ nevertheless relied on Willbanks's conclusory and unsubstantiated opinion that Newton was not disabled. Under these circumstances, the ALJ's finding that Newton had sufficient residual functional capacity to perform sedentary work is not supported by substantial evidence.

*Requirement to Obtain Supplemental Information*. -- SSR 96-2p admonishes:

> [I]n some instances, additional development required by a case – for example to obtain more evidence or to clarify reported clinical signs or laboratory findings – may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record. . . .

SSR 96-2p, 61 F.R. at 33491. SSA Regulation 20 C.F.R. § 404.1512(e) provides in pertinent part:

> (e) *Recontacting medical sources*. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> > (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. . . .

20 C.F.R. § 404.1512(e).  Subsection (d) of § 404.1512 provides in part:

> *Our responsibility*.  Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application.  We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

20 C.F.R. § 404.1512(d).

The Second Circuit has held that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callaghan*, 168 F.3d 72, 79 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.").  The Fifth Circuit also imposes a duty on an ALJ "to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *See Ripley*, 67 F.3d at 557.  "If the ALJ does not satisfy his duty, his decision is not substantially justified." *Id.*  In this case, the ALJ expressed doubts about Pertusi's opinions based on Willbanks's criticisms and Newton's later part-time work, but did not request additional information to eliminate those doubts before rejecting the opinion of the treating physician.

Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information.  *Id.*  "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed

15

the record, and that the additional evidence might have led to a different decision." *Id.* at 557 n.22.

Newton has made a sufficient showing that additional evidence could have been produced, if requested. The ALJ was faced with what she deemed an incomplete medical history. The ALJ, without obtaining the supplemental information, made medical determinations as to claimant's abilities to do specific jobs. The ALJ erred when she found, with virtually no meaningful analysis of the specific medical records, that omissions from the treating specialist's assessment or answers to interrogatories left gaps preventing a finding as to the proper weight to accord Pertusi's opinion of Newton's residual functional capacity over the four year period in issue.

### 4. Conclusion Regarding ALJ's Failure to Give Proper Weight to Treating Physician's Opinions

This is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another. *See and compare, e.g., Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993). Nor is this a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion. *See and compare, e.g., Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000). Instead, this is a case where the ALJ summarily rejected the opinions of Newton's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant. At best, the record was incomplete, and Pertusi could have

16

provided clarification or supplementation, if requested. This case is reversed and remanded for further consideration consistent with this decision.

### B.    Reliance on Medical-Vocational Guidelines

Newton argues that the ALJ should not have used the medical vocational guideline grids, 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("Grids"), when determining whether there is work in the national economy that Newton could perform despite her disability. Newton alleges that she has significant nonexertional impairments that preclude the application of the Grids and require the use of a vocational expert to establish that jobs exist which the claimant can perform.

If impairments are solely exertional or the nonexertional impairments do not sufficiently affect the claimant's residual functional capacity, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *See Fraga*, 810 F.2d at 1304. If, however, the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy. *Id.* In this case, the ALJ did not rely on a vocational expert.

Newton testified that she had nonexertional impairments including pain, swelling, and the inability to stand or sit for limited periods of time. Pertusi stated that Newton's fatigue precluded her from working an eight-hour day. The ALJ rejected these claims of nonexertional impairment, however, concluding that they were not credible.

While an ALJ's assessment of a claimant's credibility is accorded great deference, the record does not contain substantial evidence to support the ALJ's decision that Newton had

17

no significant nonexertional impairments. During the pertinent time period, Newton was hospitalized several times due to SLE flare-ups, had approximately nine emergency room visits, made numerous office visits, had abnormal laboratory results, and complained frequently of fatigue, weakness, swelling, and pain. While mild or moderate pain will not render a claimant disabled, *see Richardson v. Bowen*, 807 F.2d 444, 448 (5th Cir. 1987), the ALJ ignored Newton's claims of severe fatigue, weakness, and swelling, all of which are completely consistent with a diagnosis of SLE.

The ALJ rejected Newton's claims of nonexertional impairments without citing to any contrary evidence in the record. There was overwhelming evidence in the administrative record establishing that Newton suffered significant nonexertional impairments. The ALJ's finding of no significant nonexertional impairments is not supported by substantial evidence and is remanded for further consideration.

### C. Consideration of the Effect of Newton's Medical Treatment

Newton asserts that the ALJ failed to recognize that her ongoing treatment during the period of claimed disability rendered full-time work impossible. This court has held that if an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity. *See Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980).

While Newton did not require daily treatment as did the claimant in *Epps*, the record indicates that Newton visited the doctor, the hospital, and the emergency room frequently during the period in question. The administrative record also indicates that Newton's illness

and its treatment occasionally caused her to sleep for several hours during the day. On remand, the ALJ shall consider the effect of on-going treatment on Newton's ability to remain gainfully employed during the period of claimed disability.

### D. Appeals Council's Failure to Address Newton's Arguments and Evidence

Newton requested review from the Appeals Council based on new medical evidence. When the Appeals Council rejected her appeal, the Council issued a standard form denial.

The *Hearings, Appeals and Litigation Law Manual* (HALLEX) Section I-3-501 (Nov. 11, 1994), provides that the Appeals Council must "specifically address additional evidence or legal arguments or contentions submitted in connection with the request for review." The Council did not specifically address Newton's new medical evidence, thus violating its own internal procedures.

While HALLEX does not carry the authority of law, this court has held that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). If prejudice results from a violation, the result cannot stand. *Id.*

In this case, however, Newton was not prejudiced by the violation of HALLEX because her new medical evidence consisted of opinions regarding her condition in 1995 and 1996 which are not relevant to Newton's ability to work during the claimed disability period between 1989 and 1994. Because the new evidence was not relevant, the Appeals Council's failure to address the evidence with greater specificity did not cause Newton's need to seek relief from the federal courts.

## IV.    <u>CONCLUSION</u>

The ALJ improperly rejected the opinions of Newton's treating physician without contradictory evidence from physicians who had examined or treated Newton and without requesting additional information from the treating physician before rejecting the treating physician's opinions as unsupported or conclusory.  The ALJ also erred in relying on the medical-vocational guidelines and in failing to consider the effect of Newton's medical treatment on her ability to work.  Consequently, this court REVERSES the district court and REMANDS this case with instructions to remand to the ALJ for further consideration consistent with this opinion.